RECEIPT NUMBER
536155

52

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a
Florida corporation,

        Plaintiff,

vs.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.

Exhibits A–J

JUDGE : Gadola, Paul V.
DECK  : S. Division Civil Deck
DATE  : 12/29/2005 @ 11:21:15
CASE NUMBER : 4:05CV40397
cmp raymond james & associates
v. leonard & co, et al tam

MAGISTRATE JUDGE SCHEER

## COMPLAINT FOR TEMPORARY RESTRAINING
## ORDER AND OTHER INJUNCTIVE RELIEF

Plaintiff Raymond James & Associates, Inc. ("RJA"), for its Complaint for Temporary

Restraining Order and Other Injunctive Relief alleges as follows:

1.     Defendant Ronald Boerjan ("Boerjan"), a former financial advisor of Plaintiff

Raymond James & Associates, Inc. ("RJA"), has breached and will continue to breach

confidentiality provisions he signed with RJA and the trade-secret protections afforded to RJA

under the Michigan Uniform Trade Secrets Act ("MUTSA") by using RJA's confidential

customer information to target and solicit RJA's customers to transfer their accounts to his new

employer, Defendant Leonard & Company. Boerjan and Leonard & Company will continue in

this unlawful conduct unless an injunction is issued halting their unfair competition and

misappropriation.

## PARTIES, JURISDICTION, AND VENUE

2.     RJA is a Florida corporation, with its principal place of business located in

Florida and transacts business in Michigan.

3.      RJA is a national investment brokerage firm with offices throughout the United States, including Auburn Hills, Michigan.

4.      Defendant Boerjan is a Michigan resident.

5.      Defendant Leonard & Company is a Michigan corporation, with its principal place of business in Troy, Michigan.

6.      Defendant Leonard & Company is an investment brokerage firm that competes directly with RJA.

7.      The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

8.      Venue and jurisdiction are proper in this court pursuant to 28 U.S.C. §§1332 and 1391.

## BOERJAN'S EMPLOYMENT WITH RJA

9.      On or around January 26, 1998, Boerjan began employment with RJA's predecessor in interest, Roney & Co., as a financial advisor at the Auburn Hills branch. In 1999, after RJA purchased all of the stock and assets of Roney & Co., Boerjan became a financial advisor of RJA. Exhibit A, Robbins Aff., ¶3.

10.     As a financial advisor, Boerjan was entrusted with valuable, confidential information about RJA's investment clients, including their names, addresses, account information, investment histories, and investment preferences. Boerjan also received direct referrals from RJA employees. Id. ¶4-6.

11.     During his employment with RJA, Boerjan serviced substantially all of his accounts as a result of direct referrals he received from RJA employees. Id., ¶4.

12.     Aided by RJA's confidential customer information and the referrals, Boerjan managed RJA client assets that produced $142,769 in gross commissions over the past 12 months. Id., ¶6.

2

13.    On an annual basis, Boerjan signed a Certification wherein he agreed to abide by the provisions in the Business Ethics and Corporate Policy of RJA.  See Exhibit I, Business Ethics Policy and Certification.  Boerjan specifically agreed not to misappropriate and use of RJA's customer data to aid a competitor.  The Business Ethics Policy specifically provides:

> CONFIDENTIAL AND/OR PROPRIETARY INFORMATION OF THE COMPANY; CONFIDENTIALITY OF CUSTOMER INFORMATION
>
> *   *   *
>
> The Company's business records, including but not limited to customer lists, customer data, sales information, business methodologies, compensation records, and/or similar information are considered to be trade secrets to be used solely in the conduct of the Company's business. No such information shall be obtained, used or revealed by associates unless specifically authorized by their supervisor in the course of the regular job functions.
>
> *   *   *
>
> Associates may not divulge proprietary or confidential information, either related to the Company or to customers of the Company, to other associates unless a need-to-know basis is established in order to fulfill their responsibilities to the Company. [Id., p. 2.]

14.    At various times, Boerjan also signed an acknowledgement whereby he agreed to abide by the terms of RJA's Associates Handbook as a condition of his employment.  See Exhibit J, Associates Handbook and Certification.  The Associates Handbook specifically states:

> CONFIDENTIALITY
>
> Confidential information with respect to the Company or its clients is to be used solely for business purposes and under no circumstances revealed to unauthorized persons.  Such information may include, but is not limited to, employee payroll and compensation records, trade secrets and other proprietary information relating to the Company's business, regardless of the format in which the information is stored. Violation of this policy will result in immediate dismissal and may subject you to civil action including injunctive proceedings. [Id.]

15.    Boerjan expressly acknowledged that if he breached the Associate Handbook's confidentiality provisions, RJA would be entitled to injunctive relief. Id.

## RJA'S TRADE SECRETS AND CUSTOMER RELATIONSHIPS

16.    During the course of his employment with RJA, Boerjan was entrusted with and had access to RJA's trade secrets, including RJA's customer lists. Ex. A, ¶ 5.

17.    RJA's customer lists include the names, addresses, account information, and investment information for RJA's clients, including those serviced by Boerjan while employed by RJA. Id., ¶¶ 5, 11.

18.    RJA depends on the confidentiality of its trade secret customer lists for its continued success in the competitive investment brokerage industry. Id., ¶ 12.

19.    RJA's customer lists provide RJA with a significant competitive advantage because they derive independent economic value due to the fact that they are not readily ascertainable by proper means and are not available from outside sources. Id., ¶ 13.

20.    RJA only allows those employees who require a particular knowledge of the customer lists to have access to them and protects the information, which is stored on a computer database, with passwords. Id., ¶ 14.

21.    With the exception of the branch manager and the operations manager, a particular RJA customer's information can only be accessed by the financial advisor who is servicing that client. Id.

22.    RJA, through its own efforts, has developed and cultivated the customer list and the clients serviced by Boerjan at great expense and over a number of years. Id., ¶ 15. RJA's customer information and goodwill are the lifeblood of its business. Id. The expenditures incurred by RJA in obtaining customers include the millions of dollars spent on advertising, sales support staff, clearing services, operations personnel, systems and support, management and

compliance supervision, salaries, annual registration fees, computer services and equipment, phones, mail, research, seminars, promotional events, and many other expenditures RJA incurs in maintaining its goodwill in the securities industry and in compiling customer lists. Id.

23.     While working for RJA, Boerjan benefited directly from the goodwill, reputation, and name recognition generated by all of these expenditures and consequently was able to have a business relationship with clients on behalf of RJA. Id., ¶ 16.

24.     RJA provided Boerjan with sophisticated financial products to sell to RJA's clients as well as considerable resources to effectively manage client assets.  RJA has unique financial products that are unavailable elsewhere. Id., ¶ 17.

## BOERJAN'S RESIGNATION, MISAPPROPRIATION OF TRADE SECRETS, AND SOLICITATION OF RJA CUSTOMERS

25.     On December 23, 2005, Boerjan suddenly, and without prior notice, resigned his employment as a financial advisor with RJA and immediately began employment with Leonard & Company, a competing investment firm. Id., ¶9.

26.     Immediately upon—and even before—his resignation from RJA, Boerjan began soliciting customers he serviced while employed with RJA to cease doing business with RJA and transfer their investments to him at Leonard & Company.  Boerjan solicited at least 13 RJA customers to transfer their accounts from RJA to Leonard & Company by sending them mailings that included solicitations to transfer their accounts and enclosed pre-filled account transfer forms containing these customers' account information. Id., ¶10; See also, Ex. B, Wisniewski Aff., ¶¶4-6; Ex. C., Haffey Aff., ¶¶4-5; Ex. D, Kirchner Aff., ¶¶4-5; Ex. E, Flynn Aff., ¶¶4-5; Ex. F, Schmidt Aff. ¶4-5; Ex. G, Grabinski Aff., ¶4; and Ex. H, Gieselman Aff., ¶4.

27.     In fact, at least one RJA customer has become concerned that Boerjan is using his personal information to solicit business on behalf of Leonard & Company. Ex. C, ¶4-5.

28.     Boerjan's use of RJA's confidential customer information and solicitation of his former RJA clients to become clients of Leonard & Company constitute breaches of his fiduciary duties and his obligations under the Ethics Policy and Associate Handbook.

29.     Upon information and belief, Boerjan's conduct has been encouraged and facilitated by Leonard & Company. Ex. A, ¶ 18.

30.     The actions of the Defendants have caused and threatened to cause immediate and irreparable harm to RJA, including, without limitation, the disclosure of its confidential customer lists and damage to RJA's goodwill with its current customers.

**COUNT I**
**BREACH OF FIDUCIARY DUTY - BOERJAN**

31.     RJA incorporates by reference the allegations set forth in paragraphs 1 through 30, above.

32.     As an employee of RJA, Boerjan had an ongoing fiduciary duty to act on RJA's behalf with the utmost fairness and honesty. Boerjan also had a fiduciary duty not to unfairly harm RJA.

33.     Boerjan breached these duties by misappropriating RJA's trade secrets and using them for the benefit of Leonard & Company, a competitor of RJA.

34.     Boerjan further breached his fiduciary duties by soliciting RJA's customers to cease doing business with RJA and begin doing business with Leonard & Company.

35.     By virtue of Boerjan's breaches of his fiduciary duties, RJA has suffered damages.

36.     By virtue of Boerjan's breaches of his fiduciary duties, RJA has been and will continue to be substantially and irreparably harmed.

37. RJA has no adequate remedy at law for Boerjan's breaches of his fiduciary duties. Thus, RJA is entitled to injunctive relief.

**WHEREFORE**, pursuant to F.R.C.P. 65 and Local Rule 65.1, RJA respectfully requests that this Court grant a temporary restraining order and a preliminary injunction:

A. Enjoining Boerjan, or any person acting directly or indirectly on behalf of or in concert with him from copying, disclosing, transmitting, reviewing, using, distributing, discussing, transferring, or relying on any of RJA's trade secret customer information, including, but not limited to, its customer lists, or any other RJA documents or information;

B. Directing Boerjan and any person acting directly or indirectly on behalf of or in concert with him, to immediately return any original documents and derivatives (including copies) containing RJA client information, including but not limited to, customer lists or any other documents identifying the name, address, contact information, financial information, account information, or investment information of any RJA customer;

C. Enjoining Boerjan and anyone acting directly or indirectly in concert or on behalf of him from soliciting any of RJA's customers using RJA's trade secret customer information, including, but not limited to, its customer lists, or any other RJA documents or information; and

D. Awarding RJA damages for revenues lost from customers ceasing their business with RJA as a result of the actions of Boerjan or anyone acting in concert with him or on his behalf.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## BOERJAN AND LEONARD & COMPANY

38. RJA incorporates by reference the allegations set forth in paragraphs 1 through 37, above.

39.    RJA's confidential trade secrets described above are known only to RJA and have substantial, independent economic value derived from the fact that they are not known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

40.    RJA takes substantial steps to maintain the confidentiality of its trade secrets.

41.    RJA's customer lists are trade secrets and are entitled to protection under the Michigan Uniform Trade Secrets Act and under Michigan common law.

42.    Boerjan has misappropriated RJA's trade secrets and used them to solicit RJA's customers to cease doing business with RJA and begin doing business with Leonard & Company.

43.    Leonard & Company knew or had reason to know of the protected nature of RJA's trade secrets and received the misappropriated trade secrets from Boerjan for its direct benefit.

44.    As a result of Boerjan's and Leonard & Company's improper conduct, RJA has been and will continue to be irreparably harmed.

45.    RJA has no adequate remedy at law for Boerjan's and Leonard & Company's misappropriation of RJA's trade secrets. Thus, RJA is entitled to injunctive relief.

**WHEREFORE**, pursuant to F.R.C.P. 65 and Local Rule 65.1, RJA respectfully requests that this Court grant a temporary restraining order and a preliminary injunction:

A.    Enjoining Boerjan and Leonard & Company, or any person acting directly or indirectly on behalf of or in concert with either of them from copying, disclosing, transmitting, reviewing, using, distributing, discussing, transferring, or relying on any of RJA's trade secret

8

customer information, including, but not limited to, its customer lists, or any other RJA documents or information;

B.    Directing Boerjan and Leonard & Company, and any person acting directly or indirectly on behalf of or in concert with either of them, to immediately return any original documents and derivatives (including copies) containing RJA client information, including but not limited to, customer lists or any other documents identifying the name, address, contact information, financial information, account information, or investment information of any RJA customer;

C.    Enjoining Boerjan and Leonard & Company, and anyone acting directly or indirectly in concert or on behalf of either of them, from soliciting any of RJA's customers using RJA's trade secret customer information, including, but not limited to, its customer lists, or any other RJA document or information; and

D.    Awarding RJA damages for revenues lost from customers ceasing their business with RJA as a result of the actions of Boerjan and Leonard & Company or anyone acting in concert with or on behalf of either of them.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
## BOERJAN AND LEONARD & COMPANY

46.    RJA incorporates by reference the allegations set forth in paragraphs 1 through 45, above.

47.    RJA enjoyed valid and valuable business relationships with numerous customers whom Boerjan and Leonard & Company have unfairly competed for and wrongfully solicited.

48.    As an employee of RJA, Boerjan knew of RJA's relationships and expectancies with its customers.

49.    Boerjan and Leonard & Company have intentionally and maliciously interfered with RJA's business relationships by using RJA's confidential trade secrets to solicit RJA's customers.

50.    Boerjan and Leonard & Company have induced or caused, and will continue to induce or cause, RJA's customers to terminate their business relationships with RJA.

51.    By virtue of this tortious interference, RJA has been, and continues to be irreparably harmed.

52.    By virtue of this tortious interference, RJA has suffered damages.

**WHEREFORE**, pursuant to F.R.C.P. 65 and Local Rule 65.1, RJA respectfully requests that this Court grant a temporary restraining order and a preliminary injunction:

A.    Enjoining Boerjan and Leonard & Company, or any person acting directly or indirectly on behalf of or in concert with either of them from copying, disclosing, transmitting, reviewing, using, distributing, discussing, transferring, or relying on any of RJA's trade secret customer information, including, but not limited to, its customer lists, or any other RJA documents or information;

B.    Directing Boerjan and Leonard & Company, and any person acting directly or indirectly on behalf of or in concert with either of them, to immediately return any original documents and derivatives (including copies) containing RJA client information, including but not limited to, customer lists or any other documents identifying the name, address, contact information, financial information, account information, or investment information of any RJA customer;

C.    Enjoining Boerjan and Leonard & Company, and anyone acting directly or indirectly in concert or on behalf of either of them, from soliciting any of RJA's customers using

RJA's trade secret customer information, including, but not limited to, its customer lists, or any other RJA document or information; and

      D.     Awarding RJA damages for revenues lost from customers ceasing their business with RJA as a result of the actions of Boerjan and Leonard & Company or anyone acting in concert with or on behalf of either of them.

                           Respectfully submitted,

                           HONIGMAN MILLER SCHWARTZ AND COHN LLP

                           By:

                              Raymond W. Henney (P35860)
                         Abdu Murray (P61032)
                         38500 Woodward Avenue
                         Suite 100
                         Bloomfield Hills, MI 48304-5048
                         (248) 566-8438

Dated:  December 28, 2005

OAKLAND.1016986.1



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

        Plaintiff,

                                      Case No.

vs.                                  Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.
_____/

## AFFIDAVIT OF WAYNE ROBBINS

WAYNE ROBBINS, having been duly sworn, deposes and says:

1.      I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.      I am employed by Raymond James & Associates, Inc. ("RJA") as the Operations Manager of its Auburn Hills, Michigan branch office.  I supervise the operations of RJA's Auburn Hills branch office.  I directly supervised Defendant Ronald Boerjan ("Boerjan") while he was employed with RJA at the Auburn Hills branch.

3.      On or around January 26, 1998, Boerjan began employment with RJA's predecessor in interest, Roney & Co., as a financial advisor at the Auburn Hills branch.

4.      Boerjan serviced substantially all of his accounts as a result of referrals he received during his employment as a financial advisor for Roney & Co. and RJA.

5.    As a financial advisor, Boerjan was entrusted with valuable, confidential information about RJA's investment clients, including their names, addresses, account information, investment histories, and investment preferences.

6.    Aided by this information and the referrals, Boerjan client assets that produced $142,769 in gross commissions over the past 12 months.

7.    On annual basis, Boerjan signed a Certification wherein he agreed to abide by the provisions in the Business Ethics and Corporate Policy of RJA. The Business Ethics Policy prohibits the misappropriation and use of RJA's customer data to aid a competitor. The Business Ethics Policy specifically provides:

> CONFIDENTIAL AND/OR PROPRIETARY INFORMATION OF THE COMPANY; CONFIDENTIALITY OF CUSTOMER INFORMATION
>
> *   *   *
>
> The Company's business records, including but not limited to customer lists, customer data, sales information, business methodologies, compensation records, and/or similar information are considered to be trade secrets to be used solely in the conduct of the Company's business. No such information shall be obtained, used or revealed by associates unless specifically authorized by their supervisor in the course of the regular job functions.
>
> *   *   *
>
> Associates may not divulge proprietary or confidential information, either related to the Company or to customers of the Company, to other associates unless a need-to-know basis is established in order to fulfill their responsibilities to the Company.

8.    Boerjan also signed an acknowledgement whereby he agreed to abide by the terms of RJA's Associates Handbook as a condition of his employment. The Associates Handbook specifically states:

CONFIDENTIALITY

Confidential information with respect to the Company or its clients is to be used solely for business purposes and under no circumstances revealed to unauthorized persons. Such information may include, but is not limited to, employee payroll and compensation records, trade secrets and other proprietary information relating to the Company's business, regardless of the format in which the information is stored. <u>Violation of this policy will result in immediate dismissal and may subject you to civil action including injunctive proceedings</u>.

9.     On December 23, 2005, Boerjan suddenly, and without prior notice, resigned his employment as a financial adviser with RJA and immediately began employment with Leonard & Company, a competing investment firm.

10.     Immediately upon—and even before—his resignation from RJA, Boerjan began soliciting customers he serviced while employed with RJA to cease doing business with RJA and transfer their investments to him at Leonard & Company. Boerjan solicited at least 13 RJA customers to transfer their accounts from RJA to Leonard & Company by sending them mailings including solicitations to transfer their accounts and enclosing pre-filled account transfer forms containing these customers' account numbers.

11.     RJA's customer lists include the names, addresses, account information, and investment information for RJA's clients, including those serviced by Boerjan while employed by RJA.

12.     RJA depends on the confidentiality of its trade secret customer lists for its continued success in the competitive investment brokerage industry.

3

13.     RJA's customer lists provide RJA with a significant competitive advantage because they derive independent economic value due to the fact that they are not readily ascertainable by proper means and are not available from outside sources.

14.     RJA only allows those employees who require a particular knowledge of the customer lists to have access to them.  RJA's customer information is protected by password. With the exception of myself and the branch office manager, only the financial advisor servicing a particular client has access to that client's information.  In addition, the confidentiality of the customer information is protected by the express provisions of the Business Ethics Policy and the Associates Handbook.

15.     RJA, through its own efforts, has developed and cultivated the customer list and the clients serviced by Boerjan at great expense and over a number of years.  RJA's customer information and goodwill are the lifeblood of its business.  The expenditures incurred by RJA in obtaining customers include the millions of dollars spent on advertising, sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phones, mail, research, seminars, promotional events, and many other expenditures RJA incurs in maintaining its goodwill in the securities industry and in compiling customer lists.

16.     While working for RJA, Boerjan benefited directly from the goodwill, reputation, and name recognition generated by all of these expenditures and consequently was able to have a business relationship with clients on behalf of RJA.

4

17.     RJA provided Boerjan with sophisticated financial products to sell to RJA's clients as well as considerable resources to effectively manage client assets. RJA has unique financial products that are unavailable elsewhere.

18.     Boerjan's use of RJA's confidential customer information and solicitation of his former RJA clients to become clients of Leonard & Company constitute breaches of his obligations under the Ethics Policy and Associates Handbook. Upon information and belief, Boerjan's conduct has been encouraged and facilitated by Leonard & Company.

19.     Boerjan's conduct in violation of the Business Ethics Policy and Associates Handbook, with the aid of Leonard & Company, has caused, and will continue to cause, incalculable harm to RJA's operations at the Auburn Hills branch office.

_____
WAYNE ROBBINS

Subscribed and sworn to before me
this ___ day of _____, 2005

_____
Notary Public, State of Michigan, County of _____
My Commission Expires:
Acting in the County of

> EDWARD C. SUDZINA
> Notary Public, Oakland County, MI
> My Commission Expires 04/13/2008

OAKLAND.1017035.1

5



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

        Plaintiff,

                                     Case No.
vs.                                   Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.

_____/

## AFFIDAVIT OF DANIEL WISNIEWSKI, JR.

DANIEL WISNIEWSKI, JR., having been duly sworn, deposes and says:

1.      I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.      I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.      On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills, Michigan branch office to work for Leonard & Company.

4.      On December 26, 2005, I spoke with Janet Berman, an RJA customer whose account Boerjan serviced while he was employed with RJA.  Ms. Berman told me that she already knew that Boerjan had resigned from RJA because she received in the mail a packet of documents from Boerjan early in the week of December 19, 2005, which contained pre-filled account transfer forms and a solicitation for her to transfer her accounts from RJA to Boerjan at Leonard & Company.

5.      That same day, I spoke with Bruce Nichols, another RJA customer whose account Boerjan serviced at RJA.  Mr. Nichols told me that early the week of December 19th he also had received a packet like Ms. Berman.

6.      That same day, I spoke with Olga and Wilbur Klein whose accounts Boerjan serviced at RJA.  The Kleins told me that they had received a packet containing a solicitation and account transfer forms from Boerjan.

DANIEL WISNIEWSKI, JR.

Subscribed and sworn to before me
this 28th day of DECEMBER 2005

Notary Public, State of Michigan, County of Oakland
My Commission Expires:
Acting in the County of

EDWARD C. SUDZINA
Notary Public, Oakland County, MI
My Commission Expires 04/13/2006

2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

        Plaintiff,

vs.

                                    Case No.
                                    Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.

_____/

## AFFIDAVIT OF ANDREW HAFFEY

ANDREW HAFFEY, having been duly sworn, deposes and says:

1.     I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.     I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.     On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills, Michigan branch office to work for Leonard & Company.

4.     On December 27, 2005, I spoke with Dan Cable, whose account Boerjan serviced while employed with RJA. Mr. Cable told me that he received a letter postmarked December 23, 2005 from Boerjan and Leonard & Company soliciting him to transfer his accounts from RJA to Leonard & Company. The letter including documents containing his personal information, including his date of birth and social security number.

5.    Mr. Cable stated that he was concerned that his personal information had

left RJA.

ANDREW HAFFEY

Subscribed and sworn to before me
this 28th day of DECEMBER , 2005

Notary Public, State of Michigan, County of Oakland
My Commission Expires:
Acting in the County of

**EDWARD C. SUDZINA**
Notary Public, Oakland County, MI
My Commission Expires 04/13/2006



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

              Plaintiff,

                                   Case No.

vs.                                  Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

              Defendants.

_____/

### AFFIDAVIT OF MARK KIRCHNER

MARK KIRCHNER, having been duly sworn, deposes and says:

1.      I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.      I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.      On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills, Michigan branch office to work for Leonard & Company.

4.      On December 27, 2005, I spoke with Valerie Baker, an RJA customer whose accounts Boerjan serviced while employed with RJA. She told me that she had received in the mail a packet from Boerjan over the Christmas holiday weekend. The packet contained pre-filled account transfer forms and a solicitation to transfer her accounts to him at Leonard & Company.

5.      That same day, I spoke to Arthur Bickel, who also is a customer of RJA whose accounts Boerjan serviced at RJA. Mr. Bickel told me that he, too, received a packet from

Bocrjan on December 23rd or 24th, which contained pre-filled account transfer forms and a solicitation to transfer his accounts from RJA to him at Leonard & Company.

MARK KIRCHNER

Subscribed and sworn to before me
this 28th day of DECEMBER 2005

Notary Public, State of Michigan, County of OAKLAND
My Commission Expires:
Acting in the County of

EDWARD C. SUDZINA
Notary Public, Oakland County
My Commission Expires 04/19/2008

2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

        Plaintiff,

vs.

                                   Case No.
                                   Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.

_____/

## AFFIDAVIT OF JOANNE VELTRI FLYNN

JOANNE VELTRI FLYNN, having been duly sworn, deposes and says:

1.    I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.    I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.    On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills, Michigan branch office to work for Leonard & Company.

4.    On December 27, 2005, I spoke with Mrs. Linda Nemeth, an RJA customer whose account Boerjan serviced while employed at RJA. Mrs. Nemeth told me that she received a "packet with highlighted forms to sign" postmarked December 23, 2005 from Boerjan soliciting her to transfer her account from RJA to Boerjan at his new place of employment.

5.    On December 27, 2005, I also spoke with Ms. Pamela Kilpatrick, whose account Boerjan serviced with employed with RJA.  She told me that she received a letter from Boerjan dated December 23, 2005, requesting that she sign account transfer forms. to transfer her accounts to him at his new investment firm.

JOANNE VELTRI FLYNN

Subscribed and sworn to before me
this 28th day of DECEMBER , 2005

Notary Public, State of Michigan, County of OAKLAND
My Commission Expires:
Acting in the County of

EDWARD C. SUDZINA
Notary Public, Oakland County, MI
My Commission Expires 04/13/2006

2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

          Plaintiff,

                                    Case No.

vs.                                   Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

          Defendants.

_____/

## AFFIDAVIT OF JEREMY SCHMIDT

JEREMY SCHMIDT, having been duly sworn, deposes and says:

1.     I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.     I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.     On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his position as a financial advisor with RJA.

4.     On Monday, December 26, 2005, I spoke with Maria Fazzalari, an RJA customer whose account Boerjan serviced while he was employed with RJA. Ms. Fazzalari told me that Boerjan had contacted her the week of December 19th to tell her that he was resigning from RJA to work at Defendant Leonard & Company. Ms. Fazzalari told me that earlier in the week of December 19th, she received a packet of documents in the mail from Boerjan.

5.     On December 27, 2005, I spoke with Mr. Peter Kelly and Ms. Barbara Kratt, both of whom have accounts with RJA that Boerjan serviced while employed with RJA. Both Mr. Kelly and Ms. Kratt told me that that Boenjar had contacted them the week of December 19th,

informing them that he was resigning from RJA to work for Leonard & Company.  They also

told me that Boerjan had mailed them packets from Boerjan.

JEREMY SCHMIDT

Subscribed and sworn to before me
this 28ᵗʰ day of DECEMBER, 2005

Notary Public, State of Michigan, County of Oakland
My Commission Expires:
Acting in the County of

EDWARD C. SUDZINA
Notary Public, Oakland County, MI
My Commission Expires 04/13/2006



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

               Plaintiff,

                                       Case No.
vs.                                   Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

               Defendants.

_____/

## AFFIDAVIT OF ANDREW GRABINSKI

ANDREW GRABINSKI, having been duly sworn, deposes and says:

1.     I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.     I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.     On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills, Michigan branch office to work for Leonard & Company.

4.     On December 27, 2005, I spoke with Harmony Sierens, whose account Boerjan serviced while employed with RJA. Ms. Sierens told me that her husband

received a package from Boerjan last week soliciting them to transfer accounts from RJA

to him.

ANDREW GRABINSKI

Subscribed and sworn to before me
this 28th day of December, 2005

Notary Public, State of Michigan, County of Oakland
My Commission Expires:
Acting in the County of

EDWARD C. SUDZINA
Notary Public, Oakland County, MI
My Commission Expires 04/13/2006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC., a Florida
corporation,

        Plaintiff,

                                 Case No.
vs.                                Hon.

LEONARD & COMPANY, a Michigan corporation,
and RONALD BOERJAN, a Michigan resident,

        Defendants.

_____/

## AFFIDAVIT OF WILLIAM GIESELMAN

WILLIAM GIESELMAN, having been duly sworn, deposes and says:

1.     I make this affidavit based on personal knowledge and am competent to testify to the facts stated herein.

2.     I am employed by Raymond James & Associates, Inc. ("RJA") as a financial advisor at its Auburn Hills, Michigan branch office.

3.     On Friday, December 23, 2005, Defendant Ronald Boerjan ("Boerjan") resigned his employment as a financial advisor with RJA at its Auburn Hills branch.

4.     On December 26, 2005, I spoke with Richard Kaczmarek, whose account with RJA Boerjan serviced while he was employed with RJA. During our conversation, Mr. Kaczmarek informed me that he had received a letter from Mr. Boerjan on Saturday, December





# Human Resources / Employee Relations - RJF Business Ethics and Corporate Policy

### BUSINESS ETHICS AND CORPORATE POLICY
### OF RAYMOND JAMES FINANCIAL, INC.

Raymond James Financial, Inc. (the "Company" inclusive of all its subsidiaries and affiliates) expects its Associates (employees and its independent contractor Financial Advisors and anyone affiliated with them) to exercise the highest degree of professional business ethics in all actions they undertake on behalf of the Company. In furtherance of that objective, the Company expects its Associates to act in accordance with the RJF Business Ethics and Corporate Policy, which is distributed to new Associates and affirmed annually by all Associates. Registered associates will also be responsible for reading and understanding the Financial Advisor Instructions. This annual affirmation of the RJF Business Ethics and Corporate Policy is a condition of continued employment or affiliation.

This RJF Business Ethics and Corporate Policy is being issued in addition to the Employee Handbook, which you have previously received if you are a company employee. If you are an employee, by signing the Annual Certification Signature Page you are also representing that you have reviewed the Employee Handbook and understand its contents. **It is, therefore, important that all company employees re-read the** Employee Handbook **at this time.**

The RJF Business Ethics and Corporate Policy (the "Policy") is not exhaustive; it provides guidance for carrying out your responsibilities on behalf of the Company and observing the highest standards of ethical conduct. Because the Policy does not address every possible situation that may arise, you are responsible for exercising good judgment, applying ethical principles, and raising questions when in doubt.

## GENERAL STATEMENT

1. Neither the Company, nor any of its Associates, for their own accounts or others, shall purchase or sell securities while in the possession of information which might be considered "insider" (material, non-public) information, or discuss the information with a third party, unless a written opinion has been furnished by the Company's attorney stating that in his or her opinion the proposed transaction or discussion would not violate the anti-fraud provisions of federal or state securities laws. Information is material if there is a substantial likelihood that its public disclosure would affect either a reasonable investor's decision to buy, sell, or hold securities or the market value of securities. Information is "non-public" if it is not made generally available by the means best calculated to make it publicly available. The SEC has opined that appropriate public disclosure is required.

2. The Company and its Associates shall comply with all applicable legal requirements of the United States and each state or foreign country in which the Company conducts its business. Specifically, but not exclusively, all Associates must abide by the laws and regulations of the Securities and Exchange Commission, state regulators and self-regulatory organizations including the National Association of Securities Dealers and the various exchanges with which the Company is associated, to the extent applicable.

2005 13:26 FAX 2483337552 VG-DAS    RAYMOND JAMES    ☑003
Case 4.05-cv-40397-FVG-DAS    Document 1    Filed 12/29/2005    Page 39 of 50
Human Resources/Employee Relations - RJF Business Ethics and Corporate Policy    Page 2 of 7

3. No undisclosed or unrecorded fund or asset of the Company shall be established or maintained for any purpose.
4. No payment on behalf of the Company shall be approved without adequate supporting documentation, or shall be made with the intention or understanding that any part of the payment is to be used for any purpose other than that described by the documents supporting the payment.
5. The use of Company associates, materials or equipment for personal purposes is prohibited, unless specifically authorized.
6. Compliance with generally accepted accounting principles and established internal control procedures is required at all times.

## CONFIDENTIAL AND/OR PROPRIETARY INFORMATION OF THE COMPANY; CONFIDENTIALITY OF CUSTOMER INFORMATION

In carrying out the Company's business, associates often learn confidential or proprietary information about the Company or its customers.

The Company's business records, including but not limited to customer lists, customer data, sales information, business methodologies, compensation records, and/or similar information are considered to be trade secrets to be used solely in the conduct of the Company's business. No such information shall be obtained, used or revealed by associates unless specifically authorized by their supervisor in the course of their regular job functions. Unauthorized use of Company information or customer information, whether within or outside the Company, is a most serious violation and may result in immediate termination. Associates may not disclose Company's business or customer information to anyone or any firm outside the Company unless (i) the outside firm needs to know the information in order to perform services for the company and is bound to maintain its confidentiality; (ii) when the client has consented or been given an opportunity to request that the information not be shared (iii) as required by law or self-regulatory organization, or (iv) as authorized by the Compliance Department or the Legal Department. Associates may not divulge proprietary or confidential information, either related to the Company or to customers of the Company, to other associates unless a need-to-know basis is established in order to fulfill their responsibilities to the Company.

Likewise, unauthorized interception of Company communications, whether electronic (email), oral (telephonic), or documentary, is a violation of policy that may subject the violator to immediate termination.

Associates should be mindful of these obligations when using the telephone, fax, telex, electronic mail and other electronic means of storing and transmitting information. Associates should not discuss confidential information in public areas where it can be overheard, read confidential documents in public places or leave or discard confidential documents where they can be retrieved by others. Associates should shred all documentation containing personal or confidential customer and associate information when no longer needed.

Theft or other misuse of trade secrets and/or proprietary information will be prosecuted to the full extent provided by law. Departing associates are not permitted to take or divulge any of the data described above in the event they leave the Company, except as permitted by the RJA Financial Advisor Instructions.

## CONFLICTS OF INTEREST

The Company expects the undivided loyalty of its associates in the conduct of Company business. It is

important that associates be free from any financial interests or other relationships that might conflict with the best interests of the Company and/or cloud their judgment in carrying out the business affairs of the Company. A "conflict of interest" exists when a person's personal or professional interest is adverse to, or may appear to be adverse to, the interests of the Company. A conflict of interest may arise when an associate or a member of the associate's family receives improper personal benefits as a result of the associate's position within the Company. Accordingly, associates must report any conflict of interest to their department head and the Chair of the Corporate Governance Committee.

## CORPORATE HOTLINES

Raymond James has established a hotline for reporting any concerns regarding actions of another associate that you do not feel comfortable reporting to your supervisor, or through the normal lines of supervision within your department. This hotline is a way for Raymond James associates to register their concerns about matters which could affect the company's welfare confidentially and without fear of retaliation. The line will be monitored by the Human Resources Department which will initiate inquiries, investigations or follow up as needed. Details about the Corporate Hotline can be found in the Employee Handbook under "Standards of Performance and Conduct." Link to the Employee Handbook Index: http://lawncrest.rjf.com/HR/Content/ER/HBIndex.htm

## PRIVACY

In the conduct of business the Company and its associates collect and retain personal and confidential information about individuals. In order to strike a workable balance between the need for information and the privacy of individuals, associates shall be guided by the following principles in the collection, storage, use, and dissemination of information about the persons to whom the Company provides investments, insurance products, and other services.

1. Seek to obtain personal information only if pertinent to the effective conduct of Company business.
2. Obtain personal data by lawful and ethical means only and, to the extent practicable, obtain it directly from the individual concerned.
3. Make every effort to ensure the accuracy, completeness, timeliness, and relevance to the specific business purpose of any information concerned.
4. Make every effort to inform the individual what information will be collected, how it will be collected, and for what purposes it will be used. This requirement shall not apply to investigations involving possible criminal activity, fraud or security violations, and internal investigations by the Audit, Compliance, Legal or other departments.
5. Where required by law, make available to individuals any information that is maintained on them. In so doing, the Company reserves the right to protect the privacy of the source of the information.
6. Permit clients or associates to clarify or supplement the information held by the Company, and to correct or delete any information known to be inaccurate.
7. Limit access to information in the Company's records to those persons who have a bona fide business-related need to see it, or whose request is based on valid legal process or proper regulatory purpose.
8. Store and safeguard confidential information in a manner appropriate to its nature.
9. When creating, designing or revising any information system, ensure that the system as designed or revised is consistent with these principles.

## POLITICAL ACTIVITIES AND CONTRIBUTIONS

The Company will not make any contributions or expenditures to or for any political parties,

committees, or candidates for any public office, or to any persons for any political purpose whatsoever, regardless of whether it is proposed to be made in the United States or a foreign country or whether it would or would not be in violation of local law unless it is through a PAC established by the Company. "Contributions or expenditures" includes any direct or indirect payments, distributions, loans, advances, deposits, gifts, purchases, or tickets to dinners or other fund raising events, services (including transportation), equipment or any other items of value made to or for political candidates, parties or committees.

Although the Company encourages all associates to participate individually in civic affairs and in the political process, the Company will not reimburse associates for any expenses incurred in connection with those activities. Associates who engage in civic or political affairs must do so on their own time and at their own expense and may not use Company facilities or resources in doing so. Additionally, associates may not apply any pressure, direct or implied on any other associate that infringes on an associate's right to decide whether, to whom and in what amount a personal political contribution is to be made. (see Community Activities on Company Property policy in Employee Handbook).

Associates shall not make any contributions or expenditures to or for any candidates for any public office, or to any persons for any political purpose whatsoever that would violate the Company's policy on political contributions or any law, rule or regulation, and in particular MSRB Rule G-37. For more information, refer to the political contribution policies on the Digest.

## RECORDING AND AUDITING TRANSACTIONS

The Company has a responsibility under the law to communicate effectively so that the public is provided with full and accurate information in all material respects. To the extent that the associate is involved in the preparation of materials for dissemination to the public, the associate should be careful to ensure that the information in these materials is truthful, accurate and complete. If the associate becomes aware of a materially inaccurate or misleading statement in a public communication, the associate should report it immediately to the Chief Legal Counsel or Audit Committee or Board of Directors. Associates shall not intentionally falsify any memorandum, record or document of the Company or intentionally make a materially false or misleading statement to an accountant or representative of a regulatory agency in connection with any examination or audit of the Company's financial affairs.

Authority to open and maintain bank accounts and to arrange for the deposit or withdrawal of corporate funds has been delegated by resolution of the Board of Directors to specified personnel. All withdrawals from approved accounts shall be only by corporate check or by interbank transfer (including electronic fund transfers - EFTs/ACHs) to other Company accounts, and no check may be issued to "cash" or to a numbered bank account unless other information sufficient to identify the persons receiving the benefit of the payment appears on the face of the check. No check may be issued in a transaction that involves the direct or indirect setting aside or earmarking of funds, accounts, or monies that, regardless of purpose, are not clearly recorded and accessible to and understandable by the Company's auditors.

## ARBITRATION AGREEMENT (Michigan branch and Detroit Center associates, please refer to the separate Michigan Arbitration Agreement)

In the event of any controversy between Associates and the Company arising out of the employment relationship, including such matters as compensation, termination, all statutory discrimination claims (e.g. age, race, gender, sexual harassment, sexual orientation, national origin, religion, and disability) or ERISA, both parties agree such matter shall be determined exclusively by arbitration before the National Association of Securities Dealers (NASD) in accordance with the NASD rules then in effect. Associates

understand and acknowledge that consent to this provision constitutes a waiver of certain rights, including the right to a jury trial, which might otherwise be available in the absence of an arbitration agreement.

## ENFORCEMENT OF THE BUSINESS ETHICS CODE

The Company shall determine appropriate actions to be taken in the event of violations of this Code. Such actions are reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code.

## RAYMOND JAMES GOLDEN RULE POLICY
(Client/RJF Associate Transfer Guidelines)

*The following is a statement of Raymond James Financial policy on handling matters that involve creating a new relationship with clients or associates already affiliated with RJF.*

In all matters involving our fellow RJF associates[1], we will act as we might wish they would act toward us in similar circumstances, were our roles reversed. This describes our agreement to do nothing to solicit or encourage an investor to change from one financial advisor[2] to another, or an RJF associate to change from one RJF supervisor[3] to another.

Where either of the above occurs (**always without solicitation or encouragement**), the prospective new financial advisor or supervisor will observe the following protocol.

A. When any RJF associate encounters an investor that has an existing RJF account relationship, the proper approach will be as follows:

1. The existing financial advisor should be completely supported. Do not generate or encourage any concerns noted by the investor. This includes your review of the suitability of the investments in a standard account review. *You are not to discuss your concerns with the investor but should report anything that seems inappropriate or out of the ordinary to the Compliance Department and await direction before supporting the investor.*

2. If the client, *unsolicited,* states that he/she wants to open a new account or change advisors, the client should be told that the existing financial advisor must be contacted before that can occur. The client will be required to sign a statement verifying that the request to open a new account or transfer the account is unsolicited. The prospective new advisor must inform the existing financial advisor of the situation through direct telephone contact; email and voicemail are not acceptable. The prospective new advisor should also request that the client inform his/her existing advisor of the impending change. Email or voicemail by the client to the existing advisor is allowed.

3. If the client insists that he/she does not want to speak with the existing advisor, or does not want the financial advisor to call the existing advisor, then the new financial advisor must inform his/her branch manager or Sales Management Department of this information. The branch manager or Sales Management staff will inform the existing advisor.

If it is determined that a new account will be opened with the client or an existing account transferred to a new financial advisor:

1. After the existing financial advisor or branch manager has been notified, the new financial advisor must employ a delay of two (2) business days before submitting the Change Form (1121) or updated New Account Form to move the existing account. This will allow the existing advisor an opportunity to contact the client, as well as copy all electronic account data for his/her permanent files. This delay is unnecessary if the existing financial advisor authorizes the immediate movement of the account. If the client requests an immediate transaction, instruct the client to contact their current financial advisor or the Raymond James Client Services Department.

2. The new financial advisor will require the client to sign the Change Form (1121), verifying the transfer of the account.

3. Contacts that result from a mass marketing campaign will be handled in the same manner as described above.

B.   When any RJF supervisor encounters another RJF associate and communication about a change of affiliation to the prospective supervisor ensues, the following is to be observed by the prospective RJF supervisor (**RJF Home Office and RJA only**):

1. Advise the RJF associate that permission (if not a positive reference) by the existing RJF supervisor is required before communication continues, and that no subsequent communication may take place before the existing supervisor has been contacted.
2. If a second contact occurs before the completion of the prior step, the prospective supervisor will cease communication and notify the associate that he/she will inform the existing supervisor before any communication continues.
3. After acknowledgment is received from the existing supervisor and the prospective supervisor has received an *Application for Transfer*, the prospective supervisor may answer the associate's questions and provide relevant information about the new position. All communication must adhere to all other corporate policies and procedures. <u>Please</u> refer to the Human Resources transfer policy and/or the applicable Private Client Group sections of the Digest for further information.

C.   The following protocol is to be observed when any RJFS office attempts to hire an RJF associate, including RJFS, RJAS, and RJA branch associates:

1. Advise the RJF associate that permission (if not a positive reference) by the existing RJF supervisor is required before communication may continue.

2. After receiving permission from the existing RJF supervisor, the RJFS office may continue open communication about the position with the RJF associate.

**RJF will not tolerate solicitation of existing clients or RJF associates. Failure to adhere to this policy may subject the offending party to fines or other administrative actions. Violations may result in a reversal of commissions to the former financial advisor.**

Adherence to the "Golden Rule Policy," will demonstrate a cohesive, caring culture to all RJF clients and associates. We believe that when everyone handles these challenges and opportunities as if the involved individuals are on the same team, we <u>all</u> benefit.

Please feel free to contact your sales management team with any questions regarding the "Golden Rule Policy."

---

(1) "RJF associate" as used herein includes any associated person of RJA and RJFS including employees, independent contractors and other parties affiliated with Raymond James Financial, Inc.

(2) "Financial advisor" as used herein includes all registered representatives and registered principal affiliates with RJA and RJFS, and includes investment advisors affiliated through the Investment Advisor Division.

(3) "RJF supervisor" as used herein includes all RJA and RJFS branch managers and owners, all IAD affiliate firms' executives, and all Home Office supervisors and department managers.

Go Back To Top of Page

| Human Resources Menu | |
|---|---|
| **Employee Relations pages** <br> Anniversaries This Month \| Birthdays This Month <br> Awards <br> Classified Ads <br> Employee Discounts <br> ERC - Employee Relations Committee <br> RJ Daily Gazette  (Add to your Favorites!) <br> New Associate Information <br> Volunteer Opportunities | Group/Corporate Insurance <br> RJ Travel <br> Raymond James University - RJU <br> Personnel Directory |

To report a broken link, please contact the Digest Author for this page.

Updated August 22, 2005
Copyright © 2005, Raymond James & Associates

## Annual Compliance Meeting Certification
## 2005

I hereby certify that I attended the Annual Compliance Meeting as presented by my Branch Manager. I also confirm that I am familiar with the Compliance policies and procedures of Raymond James, and I acknowledge the ability to review the contents of the Compliance Manual via the Digest.

I understand that the National Association of Securities Dealers Inc. regulations require my attendance annually at a Compliance Meeting so that I may reacquaint myself with the rules and regulations I am governed by. I agree to comply with these regulations as well as the regulations of the other self-regulatory organizations. Moreover, I agree to comply with Raymond James' policy as stated in the Annual Ethics Policy and the firm's written supervisory procedures manuals.

Registered Person's Signature: _____

Registered Person's Name: **(Please Print)** _RONALD BOERSAN_____

Registered Person's Branch & FA Number: _3561 - 3700_____

Date: _3/29/85_____

# Annual Certification of Review of RJF Business Ethics and Corporate Policy and the Associate Handbook

I have been provided a copy of the RJF Business Ethics and Corporate Policy of Raymond James Financial, Inc. ("Raymond James") either by email or in hard copy format. I certify that I have thoroughly reviewed and understand the policies and regulations therein. I also attest that I have reviewed the 8/03 revision of the Associate Handbook (if a Company employee) and understand its contents. I understand that the guidelines and policies set forth are not all inclusive, and that management expects every associate to comply with its policies as may be published elsewhere in other company documents.

I have reviewed the Anti-Money Laundering Policy including any training updates within the prescribed time periods.

In addition, **if I am securities licensed under Raymond James & Associates (including home office and branch non income producers),** I certify that I have also reviewed and understand the RJA Financial Advisor Instructions. If I am a Retail Financial Advisor, I acknowledge that the title awarded to me is one of recognition in sales. This title does not indicate I am a corporate officer. I am not allowed or authorized to sign documents as a corporate representative of the firm. My title must always be followed by the word "Investments".

Michigan associates, please link to this separate page containing the Michigan Arbitration Agreement. (All Michigan branch and Detroit center associates must sign and return the Michigan Arbitration Agreement along with this completed Signature Page).

I have been offered an opportunity to ask questions about any provisions that are unclear. **I agree to abide by the provisions of all of these documents.** Additionally, I specifically authorize Raymond James, from time to time in their discretion, to obtain a full consumer (credit) report, and I acknowledge receipt of the "Consumer Disclosure" included in the attached RJF Business Ethics and Corporate Policy.

I understand that the Associate Handbook is not a contract for employment, but that compliance with its guidelines and policies are conditions of employment. In keeping with the Employment at Will doctrine, Associates have the right to leave the Company at any time, and the Company has the right to terminate the employment relationship at any time.

I further certify that I have disclosed to the Human Resources Department if I have ever been arrested, indicted, convicted, or entered a plea of guilty or nolo contendere in connection with any misdemeanor or felony, other than minor traffic offenses. (Driving Under the Influence (DUI) must be disclosed.) I also certify that I have disclosed to the Human Resources Department any bankruptcies during the past 10 years, and any outstanding judgments/liens.

| | |
|---|---|
| Associate's Name: RONALD DOERJAN | |
| *(Please print legibly. Return all pages of signature form if it does not print on single page.)* | |
| Branch or Dept. #: 35G | Date: 8/19/03 |
| Associate's Signature: Ron Doerj | |

**Please return completed form within 5 days to your manager/designee,** who will check off receipt and forward all forms from the branch/dept. to RJA-Registrations (1ST) by **September 2, 2003.**

AUG 2 7 2003



NOT FOR CLIENT USE

# Human Resources / Employee Relations - Ethics Policy - RJF Signature Page

### Annual Certification of Review of RJF Business Ethics Policy

I have been provided a copy of the Business Ethics Policy of Raymond James Financial, Inc. ("Raymond James") either by email or in hard copy format. I certify that I have thoroughly reviewed and understand the policies and regulations therein. I also attest that I have reviewed the Employee Handbook (if a Company employee) and understand its contents.

I have reviewed the Anti-Money Laundering Policy including any training updates within the prescribed time periods.

In addition, **if I am securities licensed under Raymond James & Associates (including home office and branch non income producers)**, I certify that I have also reviewed and understand the RJA Financial Advisor Instructions. If I am a Retail Financial Advisor, I acknowledge that the title awarded to me is one of recognition in sales. This title does not indicate I am a corporate officer. I am not allowed or authorized to sign documents as a corporate representative of the firm. My title must always be followed by the word "Investments".

Michigan associates, please link to this separate page containing the Michigan Arbitration Agreement. (All Michigan branch and Detroit center associates must sign and return the Michigan Arbitration Agreement along with this completed Signature Page).

I have been offered an opportunity to ask questions about any provisions that are unclear. **I agree to abide by the provisions of all of these documents.** Additionally, I specifically authorize Raymond James, from time to time in their discretion, to obtain a full consumer (credit) report, and I acknowledge receipt of the "Consumer Disclosure" included in the attached Business Ethics Policy.

The policies described herein are conditions of employment. In keeping with the Employment at Will doctrine, Associates have the right to leave the Company at any time, and the Company has the right to terminate the employment relationship at any time.

I further certify that I have disclosed to the Human Resources Department if I have ever been arrested, indicted, convicted, or entered a plea of guilty or nolo contendere in connection with any misdemeanor or felony, other than minor traffic offenses. (Driving Under the Influence (DUI) must be disclosed.) I also certify that I have disclosed to the Human Resources Department any bankruptcies during the past 10 years, and any outstanding judgments/liens.

| Associate's Name: RONALD BOERJAN | |
| (print legibly)  **NOTE:  Return all pages of signature form if it does not print on single page.** | |
| Branch or Dept. #: 35G | Date: 7/17/2002 |
| Associate's Signature: | |

Please return completed form within 5 days to your manager/designee, who will check off
receipt and forward all forms from the branch/dept. to HR-Registrations (1ST) by **July 31, 2002.**
To report a broken link, please contact the Digest Author for this page.
Updated July 8, 2002
Copyright © 2002, Raymond James & Associates

JUL 3 0 2002
7/17/2002



# Raymond James & Associates Handbook: Confidentiality

Confidential information with respect to the Company or its clients is to be used solely for business purposes and under no circumstances revealed to unauthorized persons. Such information may include, but is not limited to, payroll and compensation records, trade secrets and other proprietary information relating to the Company's business, regardless of the format in which the information is stored. Associates who violate this policy will be subject to immediate dismissal and may be subject to civil action including injunctive proceedings.

## ASSOCIATE HANDBOOK
## ACKNOWLEDGEMENT

I acknowledge I have accessed and read the online Associate Handbook located on the Raymond James Digest http://lawncrest.rjf.com/HR/content/ER/HBindex.htm and that I have been given the opportunity to ask my supervisor or a member of Human Resources questions about any policies or procedures I do not understand.

I understand that the guidelines and policies set forth are not all inclusive, and that management expects every associate to comply with its policies as may be published elsewhere in other company documents. I understand that the Associate Handbook is not a contract for employment, but that compliance with its guidelines and policies are conditions of employment. In keeping with the Employment at Will doctrine, Associates have the right to leave the Company at any time, and the Company has the right to terminate the employment relationship at any time.

I understand that the policies, procedures and benefits described in this Handbook are subject to change, addition or deletion by the company at any time, and that my continued employment will constitute my acceptance of such changes.

I understand that as changes occur, you will strive to inform me of them as soon as administratively possible. I further understand updates will be highlighted in the "Daily Gazette" or by other appropriate means of communication.

*Ronald Boerman*        35G        3700

**Print Name**                    **Dept. / Branch Name & Number**

*Ronald Boerman*        8/19/03

**Employee Signature**           **Date**

*1/28/98*

**Date of Hire**

Revised: 8/03

AUG 2 2 2003