UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC.,

                    Plaintiff,

                                  CIVIL CASE NO. 05-40397

v.

LEONARD & COMPANY, and RONALD      HONORABLE PAUL V. GADOLA
BOERJAN,                                    U.S. DISTRICT COURT

                    Defendants.
_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Raymond James & Associates, Inc., ("RJA") filed its complaint on December 29, 2005. Plaintiff filed a motion seeking a temporary restraining order and a preliminary injunction the same day. In this Court's absence, Judge Tarnow presided over a telephone conference between the parties regarding the temporary restraining order (" TRO") on the day the motion was filed. He did not rule on the motion, but instead advised the parties to extend their conversation and to work out as many issues as possible prior to a hearing in this Court. On January 6, 2005, this Court held a hearing on the issuance of a TRO and a preliminary injunction. The motion for a TRO was denied, and the motion for a preliminary injunction was taken under advisement. For the following reasons, the Court now denies Plaintiff's motion for a preliminary injunction.

**I.**      **Background**

RJA is a national securities investment brokerage firm with offices throughout the United

States. This lawsuit concerns RJA's office in Auburn Hills, Michigan, at which Defendant Ronald Boerjan was employed until he resigned on December 23, 2005 and began working with RJA's competitor, Defendant Leonard & Company ("LC"). Upon resigning, Boerjan immediately solicited clients that he serviced while at RJA to transfer their accounts to LC. The solicitations, which were signed by Boerjan, included account transfer forms pre-filled with the respective client's account numbers and personal information. RJA claims that Boerjan most likely solicited many, if not all, of his former clients,[1] though the individual affidavits of eight of RJA's employees submitted with its complaint identify only thirteen.

According to Boerjan, he acquired a substantial number of his clients while he was employed by another brokerage firm and had even convinced those clients to follow him to a firm which was later acquired by RJA. In fact, RJA's predecessor asked Boerjan to provide his clients' latest monthly statements and Boerjan's own "posting pages," so that it could prepare account transfer forms much the same way that LC has done.[2] Boerjan's posting pages are a record of the transactions Boerjan has completed for his clients. The posting pages, or "book of business," are industry standard and contain the client's personal information, including the name, address, telephone number, social security number and investment history, for each account serviced.

---

[1] A customer of a brokerage firm is often referred to as the client of the individual financial advisor who services his account, despite that account being held by the firm and not the financial advisor, because the financial advisor is often the sole employee of the firm who services the client. Many clients, in fact, consider themselves to be such.

[2] In a case relied on by RJA, *Merrill Lynch v. Hagerty*, 808 F. Supp. 1555, 1557 (S.D. Fla. 1992), one of RJA's Florida offices is accused of perpetrating the exact same acts that RJA now accuses LC of doing.

Boerjan states in his affidavit that he started to maintain his posting pages when he was first employed as a broker over twenty-five years ago and that his posting pages are his property. Resp., Ex. A, at ¶¶ 10-11. He also avers that RJA's CEO told him and others at an October, 2005 yearly compliance meeting that "you own your book" and that they were free to take their book of business with them when they left RJA. *Id.* at ¶ 14. This corroborates Boerjan's assertion that RJA offered to buy his book of business for approximately $60,000.00 as part of an ultimatum that Boerjan either increase his monthly gross commissions or be terminated. *Id.* at ¶¶ 20-28. RJA has not refuted these assertions.

According to RJA, Boerjan obtained the information which allowed him to solicit RJA's clients from RJA's confidential customer lists which RJA claims are trade secrets necessary for its continued success in the investment brokerage industry. RJA maintains a Business Ethics and Corporate Policy ("Ethics Policy") which provides:

> The Company's business records, including but not limited to customer lists, customer data, sales information, business methodologies, compensation records, and/or similar information are considered to be trade secrets to be used solely in the conduct of the Company's business. No such information shall be obtained, used or revealed by associates unless specifically authorized by their supervisor in the course of their regular job functions. Unauthorized use of the Company information or customer information, whether within or outside the Company, is a most serious violation and may result in immediate termination.

Compl., Ex. I. Boerjan certified annually that he understood RJA's policy and agreed to follow it. Boerjan also signed an acknowledgment that he had read RJA's Associates Handbook which provides:

> Confidential information with respect to the Company or its clients is to be used solely for business purposes and under no circumstances revealed to

> unauthorized persons. Such information may include, but is not limited to, payroll and compensation records, trade secrets and other proprietary information relating to the Company's business, regardless of the format in which the information is stored. Associates who violate this policy will be subject to immediate dismissal and may be subject to civil action including injunctive proceedings.

Compl., Ex. J. The annual affirmation of RJA's Ethics Policy was "a condition of continued employment or affiliation" in furtherance of RJA's expectation that "its Associates . . . exercise the highest degree of professional business ethics in all actions they undertake on behalf of the Company." Compl., Ex. I. The Associates Handbook acknowledgment which Boerjan signed stated that "I understand that the Associate Handbook is not a contract for employment, but that compliance with its guidelines and policies are conditions of employment." In other words, both RJA's Ethics Policy and Associates Handbook guidelines governed Boerjan's actions while he was employed by RJA, not afterwards. Furthermore, Boerjan did not sign any non-solicitation or non-compete agreement with RJA, nor did he sign any agreement altering the parties' property rights in any information.

RJA seeks a preliminary injunction enjoining Boerjan and LC from contacting or soliciting any of RJA's clients whom Boerjan serviced, as well as from using, disclosing, or disseminating RJA's trade secrets, which RJA's considers to include its customer lists, and any other RJA information. RJA also requests that Defendants be directed to return any original documents and derivatives containing RJA client information. At the hearing, RJA stated that it is only asking that Defendants be enjoined for approximately 60 days to allow it to rectify Boerjan's alleged breach of confidentiality and breach of fiduciary duty without interference from Boerjan. In essence, RJA wants time to persuade its clients to remain with RJA without competition from Boerjan.

## II.     Standard

A district court may issue a preliminary injunction if it is so favored by the balance of four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999) (quoting *Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997)); *See also DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985). These four considerations "are factors to be balanced, not prerequisites that must be met." *DeLorean*, 755 F.2d at 1229. A district court must make specific findings concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Finally, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Here, the balance of the factors does not favor granting a preliminary injunction because RJA does not have a likelihood of success on the merits. For the first factor to favor the granting of an injunction, "a plaintiff must demonstrate a strong or substantial likelihood or probability of success."

*United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992). A likelihood of success is not sufficient to meet this standard; RJA must demonstrate that the likelihood is "strong or substantial." *Id.*

RJA's complaint contains three counts: misappropriation of trade secrets; breach of fiduciary duty; and tortious interference with a business expectancy. RJA's claim for misappropriation of trade secrets is brought under Michigan's Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901, *et seq.* MUTSA became effective October 1, 1998. M.C.L. § 445.1910. It provides injunctive relief and remedies for the misappropriation of trade secrets. M.C.L. § 445.1903-04. According to MUTSA,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(d).

RJA claims that it will succeed on its claim for trade secret misappropriation, because its customer lists met the definition and are entitled to trade secret protection. The Court, however, disagrees. The information Boerjan used to solicit RJA's clients is not the subject of efforts that are reasonable under the circumstances to maintain its secrecy. RJA claims to protect the secrecy of this information by keeping it in a password protected database and requiring its employees to maintain its confidentiality. Nevertheless, the goal of secrecy is completely defeated by RJA's practice of

allowing its brokers to maintain posting pages that contain essentially the same information, yet are the broker's property which he is free to take with him when he departs RJA. *C.f. Hayes-Albion v. Kuberski*, 421 Mich. 170, 176 (1984) ("Although much of plaintiff's technology is embodied in a manufacturing procedures manual, commonly referred to within the company as the 'Bible,' employees are forbidden to remove that document from the plant premises."). Furthermore, there is some question as to whether the information is readily ascertainable by proper means. The Sixth Circuit, in applying Kentucky's Uniform Trade Secrets Act, which contains a trade secret definition virtually identical to that in MUTSA, K.R.S. § 365.880(4), held that

> [i]n determining whether information is readily obtainable by proper means, courts generally distinguish between, on one hand, lists of customers "discoverable only through extraordinary efforts and . . . through many years' expenditure of time and money," such as purchasers of HIV medications who value confidentiality, or the purchasers of unusual goods or services not generally known to an industry at large, and, on the other hand, lists of customers whose identities as purchasers of a given type of product may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses.

*ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005) (citations omitted). While the customer lists in the case at bar may not be readily ascertainable from telephone books or the internet, they are readily ascertainable from other legitimate channels, viz., Boerjan's memory and posting pages. *See UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447 (W.D.N.C. 2002) (holding that a brokerage firm's customer lists containing names and addresses were not trade secrets under statute nearly identical to MUTSA even though the plaintiff had "consistently taken steps to keep this information secret," because information was readily ascertainable through independent development).

7

This conclusion is consistent with case law. In *Hayes-Albion v. Kuberski*, the Michigan Supreme Court held that customer lists of the type involved in the case at bar, i.e., those that were developed through the participation of the employee and contain knowledge regarding the needs of customers, are not trade secrets:

> The information regarding the identity of its customers is more problematic. Ninety-nine percent of International Silicone's business ($ 146,393 of $ 147,431) came from former customers of Gladen. Kuberski appears to be correct, however, that he did not "steal" a list of customers that plaintiff had kept secret. Kuberski had significant customer contact while employed with plaintiff, and he kept the names and addresses of customers in a personal memo book, as he had done in his previous employment with RCA. In general, there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment.
>
> Because of his position as plaintiff's chief engineer, Kuberski learned about the peculiar needs of particular clients. This information increased Kuberski's ability to compete with plaintiff, and raises issues similar to those resolved by this Court in the related cases of *Follmer, Rudzewicz & Co., PC v Kosco and Nolta-Quail-Sauer & Associates v Roche*, 420 Mich 394; 362 NW2d 676 (1984). There we recognized that although such information is not a trade secret at common law, an employer may have a protectable interest in information about client needs that an employee gains by virtue of his employment. We recognized further, however, that a customer has a right to deal with the person he chooses, and that *the remedy for the use of information about a client's needs in violation of an agreement respecting the employee providing services to the customer after termination of employment, is money damages.* To enjoin the employee from providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals.

*Hayes-Albion*, 421 Mich. at 183-184 (footnotes omitted) (emphasis added). Although *Hayes-Albion* was decided before MUTSA, it still retains value for determining what constitutes a trade secret under Michigan law, first, because statutes must be read in light of the common law, *see United States v. Rodgers*, 461 U.S. 677, 716 (U.S. 1983) (quoting *United States v. Sanges*, 144 U.S.

310, 311 (1892)); *Hasty v. Broughton*, 133 Mich App. 107, 113 (1984), and second, because the definition of a trade secret on which the Michigan Supreme Court relied, while not grammatically identical, was congruent to the definition provided by MUTSA.[3] In *McKesson Med. - Surgical, Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590 (E.D. Mich. 2003) (Duggan, J.), a case decided after the enactment of MUTSA, the court relied heavily on *Hayes-Albion*, stating:

> In this Court's opinion, customer lists developed by the employee are not protectable "trade secrets." To the extent that the list of customers accumulated by the employee includes "needs of customers" as learned by employee during the course of his employment, such information is not protectable as a "trade secret." It is, however, protectable under an agreement in which the employee agrees not to disclose such information. *See Hayes-Albion*.
>
> To hold otherwise, would subject every former employee who elects to call on customers he previously called upon with the former employer to a lawsuit for "trade secret" violation because it is likely, in all those situations that, the former employee would be aware of the needs of these customers which he/she learned about during employment with the previous employer. To allow McKesson to prevail on its trade secrets claim in the case at bar would essentially interpret the MUTSA

---

[3] The Michigan Supreme Court relied on the Restatement of Torts, § 757, Comment b, including a number of factors offered by the Restatement for consideration:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . .
>
> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Hayes-Albion*, 421 Mich. at 181-182.

> to be a blanket, statutorily created non-compete agreement between sales people and their former employers. This would not serve the purpose of trade secrets law. *See Fleming Sales Co., Inc. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985), (stating that allowing a similar claim would "not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous business competition").
>
> If an employer wishes to restrict an employee's use of such information after the employment relationship is terminated, the employer must do it with an appropriate non-competition agreement.

*McKesson*, 266 F. Supp. 2d at 596-597. RJA argues that these cases are distinguishable because they did not concern a confidentiality agreement such as Boerjan agreed to by agreeing to abide by RJA's Ethics Policy and Associates Handbook. Yet, an agreement to keep information confidential, does not, by itself, turn that information in a trade secret. *See Merrill Lynch v. E.F. Hutton & Co.*, 403 F. Supp. 336 (1975) ("[A]n interest in maintaining confidentiality may not, in itself, necessarily elevate information to the status of a trade secret.").

The primary cases upon which RJA relies, *Merrill Lynch v. Ran*, 67 F. Supp. 2d 764 (E.D. Mich. 1999) (Steeh, J.); *Merrill Lynch v. Kramer*, 816 F. Supp. 1242 (N.D. Ohio 1992); and *Merrill Lynch v. Hagerty*, are all distinguishable and inapplicable to the case at bar because the defendants in each of them expressly agreed not to compete with the plaintiff or solicit plaintiff's customers and that all customers records were the property of the plaintiff during and after employment. Each defendant signed the following agreement or one similar in form and substance:

> 1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form, or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be

> transmitted verbally, except in the ordinary course of conducting business for Merrill Lynch.
>
> 2. In the event of termination of my services with Merrill Lynch for any reason, I will not solicit, any of the clients of Merrill Lynch whom I serve or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch or any subsidiary thereof at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated, I understand that I will be liable to Merrill Lynch for any damage caused thereby.

*Kramer*, 816 F. Supp. at 1243.

RJA relies on an alternative holding in *Ran* in which the court held even if the restrictive covenants were unenforceable against the defendant, the plaintiff's customer lists would still be entitled to trade secret protection under MUTSA. *Ran*, 67 F. Supp. 2d at 775. As support for this ruling, the court relied on the appellate case of *Hayes-Albion v. Kuberski*, 108 Mich. App. 642 (1981), not the subsequent Michigan Supreme Court case. In the appellate case, the Michigan Court of Appeals found that the plaintiff's customer lists and sources of materials were discoverable through research and investigation. *Id.* at 651. Even so, the appellate court held that, because the defendants did not acquire the information through independent research or investigation, the trial court did not err by finding that the information was confidential and that the defendants were not entitled to its use. Because the lists were "stolen," the court held, use of the lists were enjoinable. The defendants could, however, purchase the lists if they were publicly available. *Id.* at 652. As stated above, however, the Michigan Supreme Court held that the defendant "did not 'steal' a list of customers that plaintiff had kept secret." Instead, the defendant "had significant customer contact," that he "kept the names and addresses of customers in a personal memo book," and that

11

"there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment." *Hayes-Albion*, 421 Mich. at 183.

RJA also relies on *Kramer* and *Hagerty*, both of which found that the plaintiff's customer list were protectable trade secrets under Ohio and Florida law, respectively. Ohio law explicitly defines a trade secret to include "listing of names, addresses, or telephone numbers." O.R.C. § 1333.61(D). Similarly, Florida law explicitly defines a trade secret to include a "list of suppliers" and a "list of customers." Fla. Stat. § 812.081(1)(c). In both *Kramer* and *Hagerty*, the requisite secrecy was provided by the defendants' agreements, which provided that all records were the property of the plaintiff and that

> . . . none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form, or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally, except in the ordinary course of conducting business for Merrill Lynch.

*Kramer*, 816 F. Supp. at 1243. The factors present in *Ran*, *Kramer* and *Hagerty*, the agreements and the differences in the law, are what enabled the courts to find that the respective plaintiff's customer lists were trade secrets. Those factors are simply not present here. RJA's confidentiality agreements are not comparable to the agreements in *Ran*, *Kramer* and *Hagerty*, especially in light of Boerjan's property interest in his posting pages. Consequently, the Court concludes that RJA is not likely to succeed on the merits of its misappropriation of trade secrets claim.

Turning now to RJA's claim for tortious interference with a business expectancy, RJA claims that Defendants have maliciously interfered with RJA's relationships and expectancies with its

customers by using RJA's confidential trade secrets to solicit its customers. As support for this cause of action, RJA relies on *Tata Consultancy Servs. v. Systems Int'l*, 31 F.3d 416 (6th Cir. 1994). *Tata*, although helpful, concerns tortious interference with contractual relationships, *see id.* at 417, and RJA has nowhere alleged that it had any contractual relationships with its customers. Instead, the Court looks to *BPS Clinical Lab. v. Blue Cross & Blue Shield*, 217 Mich. App. 687, 698-699 (1996), which stated:

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff.

*BPS Clinical Lab. v. Blue Cross & Blue Shield*, 217 Mich. App. 687, 698-699 (1996) (citations omitted). Additionally, "one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green*, 138 Mich. App. 360, 369-370 (1984). "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Lab.*, 217 Mich. App. at 699. It is important to bear in mind that "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.*

While there existed a valid business relationship or expectancy between RJA and its customers, of which Defendants certainly were aware and which Defendants intentionally

interfered—they had prepared forms which enabled the customer to transfer his account from RJA to LC—RJA has not established that Defendants actions were "per se wrongful or with malice." As the Court reasoned above, for the purposes of this instant motion, RJA's customer lists were not protectable trade secrets, so Defendants use of the information was not per se wrongful or with malice. Instead, Defendants actions were "motivated by legitimate business reasons," and therefore "[do] not constitute improper motive or interference." *Id.* Again, according to the Supreme Court of Michigan, "in general, there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment." *Hayes-Albion*, 421 Mich. at 184 (footnote omitted).

RJA alleges that Defendants solicited its customers while Boerjan was still employed by RJA. RJA produces the affidavit of one it its financial advisors that states that two of its clients, including one Bruce Nichols, received Boerjan's solicitation packet early in the week of December 19, 2005, which was a few days before Boerjan's resignation. Compl., Ex. B at ¶¶ 4-5. RJA also provides the affidavit of another financial advisor that states that Boerjan contacted two other clients early in the week of December 19, 2005, but that the clients received his solicitation packet after he had resigned. Compl., Ex. F at ¶¶ 4-5. The remain affidavits from financial advisors do not make this claim, many of them instead averring that the clients had received Boerjan's solicitation letter after he signed or that the solicitation packet was postmarked the day he resigned. Compl., Exs. C, D, E, G, H. To counter, Boerjan averred that he did not solicit RJA's clients, by mail or telephone, prior to his resignation. Resp., Ex. A. Defendants also submit affidavits by LC's director of broker relations and Bruce Nichols, RJA's client mentioned above. LC's director of relations states that

14

he mailed Boerjan's solicitation packages after Boerjan called him on December 23, 2005, sometime after 4:00 p.m., to inform him of his (Boerjan's) resignation. Resp., Ex. G. Bruce Nichols states that he received Boerjan's solicitation packet on December 24, and that it was post marked on December 23, contrary to RJA's employee's assertions. Resp., Ex. F. The Court believes Defendants version of the events to be more accurate.

At the hearing, RJA argued that Boerjan must have given its confidential customer information to LC before he resigned to enable them to complete the solicitation packages. That LC received any such information before Boerjan resigned, or that they prepared the solicitation packages is unsubstantiated. RJA does not allege in its complaint that Boerjan gave LC this information while he was still employed by RJA, and all that the evidence so far establishes is that the packages were from Boerjan and mailed by LC. As for Boerjan's preparation of the packages while he was employed by RJA, it is not clear that he was competing at that time; he could have merely been preparing to compete. *See E. F. Hutton & Co.*, 403 F. Supp. 336, 342-343 (E.D. Mich. 1975) ("There is no affirmative proof that the materials were put into the possession of Hutton, or were otherwise used by defendants in an untoward manner at that time. Thus, there remains a substantial question as to whether defendants were simply making arrangements to compete, or engaging in proscribed forms of competition. The existence of such a question is sufficient to defeat plaintiff's motion [for a preliminary injunction] at this time.") (citing Restatement (Second) of Agency, § 393 cmt. e). *See also Fitness Experience, Inc. v. TFC Fitness Equip., Inc.*, 355 F. Supp. 2d 877, 893 (N.D. Ohio 2004) ("[P]reparing to compete" is qualitatively different than actually competing with one's present employer and will not, by itself, support a breach of loyalty claim.").

For these reasons, RJA has not established a likelihood of success on the merits of its claim for interference with a business expectancy.

Finally, RJA has not demonstrated a likelihood of success on the merits of his breach of fiduciary duty claim. It is clear that Boerjan was an agent of RJA, and while he was an agent, he "[was] subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency, § 387. This rule "forbids the doing of acts in competition with the principal and the acquisition of interests adverse to him." *Id.*, cmt a. RJA quotes a pertinent illustration from the restatement:

> A, the manager of P, a stockbroker, promises T that he will reveal to T for T's benefit the transactions of one of P's customers. A is not authorized to make such a promise and if he thereafter performs it, he has committed a breach of duty to P.

*Id.*, cmt. a, Ill. 1. Aside from his apparent preparations to compete, Boerjan's actions, however, were accomplished after he was no longer an agent of RJA. Preparations, of themselves, do not support a breach of fiduciary duty sufficient to support an injunction, given "the public policy of Michigan . . . of protecting and encouraging the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another." *Hayes-Albion*, 421 Mich. at 188. *See E. F. Hutton & Co.*, *supra* at 15. Boerjan's continued use of the customer information, after his employment, also does not support a breach of fiduciary duty because, although he agreed to keep that information confidential during his employment with RJA, Boerjan's "personal memo book" or posting pages are his property, property which he did not contract away. *Hayes-Albion*, 421 Mich. at 83. RJA impliedly admitted to Boerjan's right to pursue his book of business when it unsuccessfully offered to buy it for $60,000.00. *See also McKesson*,

16

266 F. Supp. 2d at 597 ("If an employer wishes to restrict an employee's use of such information after the employment relationship is terminated, the employer must do it with an appropriate non-competition agreement.").

RJA relies on *Chem-Trend, Inc. v. McCarthy*, 780 F. Supp. 458 (E.D. Mich. 1991) (Newblatt, J.) for the proposition that there is a "continuing fiduciary duty that [Boerjan] owes to his former employer; the duty 'not to take advantage of a still subsisting confidential relation created during the prior agency relation.'" *Id.* at 463 (quoting Restatement (second) of Agency, § 396(d)). *Chem-Trend* is distinguishable from the present case for several reasons. First, *Chem-Trend* was a particularly egregious case where, for several months, the defendant committed serious breaches of his fiduciary duty while he was still employed by the plaintiff:

> The record demonstrates that McCarthy began manufacturing competitive products several years before resigning from Chem-Trend, marketing these products exclusively to Chem-Trend's own customers several months before leaving Chem-Trend, and actually consummating bulk scale sales of these products in place of Chem-Trend products several weeks before his departure. As logic dictates, and the testimony of Guy Busch underscores, McCarthy's covert duplicity meant that Chem-Trend had no one at all inquiring and responding as to customer problems and needs, and seeking to meet those needs with Chem-trend products, for many months. The results were predictably devastating. More than twenty customers, developed and garnered at great expense over a period of some ten years, were lost to Defendants overnight. As detailed below by Guy Busch, such McCarthy tactics as cutting off Chem-Trend credit to a long term customer and then turning around and selling his own product to that customer, left the marketplace confused, left Chem-Trend's hard-earned goodwill in a shambles, and left McCarthy in the exclusive position of appearing ready and able to grant the wishes of customers that he had for many months failed to communicate to his employer.

*Id.* at 461-62. This outrageous conduct certainly influenced the court. Whereas, Boerjan switched brokerage firms to avoid involuntary termination and waited until he resigned before competing with

his former employer.  Second, the customer information in *Chem-Trend* that the defendant had access to was "not legitimately available for any amount of money, and [the defendant] could acquire it from nowhere else." *Id.* at 461.  Boerjan, on the other hand, can acquire information on RJA's customers from his posting pages, which were not memoranda entrusted to him, but his own personal property to which RJA itself assigned a fixed price. *C.f.* Restatement (second) of Agency, § 396 cmt. b ("an agent cannot properly subsequently use copies of written memoranda concerning customers, which were entrusted to him or made by him for use in the principal's business"). *See also Hayes-Albion*, 421 Mich. at 183-184.

### IV.    Conclusion

In conclusion, because the Court finds that RJA has not established a likelihood of success on the merits, the Court will deny its motion for a preliminary injunction.  Consideration of the remaining three factors is unnecessary.  *See Gonzales*, 225 F.3d at 625.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Plaintiff's motion for a preliminary injunction [docket entry 2] is **DENIED**.

**SO ORDERED.**

Dated:   January 23, 2006                             s/Paul V. Gadola
                                                     HONORABLE PAUL V. GADOLA
                                                     UNITED STATES DISTRICT JUDGE

Certificate of Service

I hereby certify that on   January 24, 2006  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
  Raymond W. Henney; Dennis J. Levasseur; Abdu H. Murray; Brian C. Summerfield   ,
and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                                                                                           .

                s/Ruth A. Brissaud
                Ruth A. Brissaud, Case Manager
                (810) 341-7845